**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

BRAMPTON BRICK, INC.,                )
                                     )
            Plaintiff,               )
                                     )
    v.                               )    Case No. 1:26-cv-00468
                                     )
BRICKCRAFT, INC. and HALQUIST        )
LEASING, LLC,                        )
                                     )
            Defendants.              )

## COMPLAINT FOR DAMAGES

Plaintiff, Brampton Brick, Inc. ("Plaintiff or "Brampton"), by counsel, for its *Complaint*

*for Damages* against Defendants BrickCraft, Inc. and Halquist Leasing, LLC (collectively,

"Defendants"), respectfully states and alleges as follows:

### Parties, Jurisdiction and Venue

1.      Plaintiff is a corporation incorporated under the laws of the State of Indiana, now

voluntarily dissolved, with its principal place of business in Terre Haute, Indiana. Plaintiff retains

capacity to prosecute this action pursuant to Indiana Code § 23-1-45-5.

2.      Defendant BrickCraft, Inc. ("BrickCraft") is a corporation organized under the

laws of the State of Wisconsin with its principal place of business in Sussex, Wisconsin.

3.      Defendant Halquist Leasing, LLC ("Halquist") is a limited liability company

organized under the laws of the State of Nevada and none of its members are citizens of the State

of Indiana.

4.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(1) because the

action is between citizens of different states and the amount in controversy exceeds $75,000,

exclusive of interest and costs.

5.    Complete diversity exists between Plaintiff and Defendants.

6.    Venue is proper in this Court under 28 U.S.C. § 1391(b), and each party has irrevocably submitted to the exclusive jurisdiction of the federal courts of the United States of America or the courts of the State of Indiana pursuant to Section 10.08(a) of the Asset Purchase Agreement (as defined herein) agreed between Plaintiff and Defendants. (*Exhibit 1*.)

## INTRODUCTION

7.    On September 13, 2024, Brampton, defined as "Seller," and Defendants, collectively defined as "Purchaser," executed that certain Asset Purchase Agreement (the "Agreement") for the sale of Brampton's clay brick manufacturing business to BrickCraft for the approximate sum of ten million seven hundred fifty thousand dollars ($10,750,000) (the "Purchase Price"). A true and accurate copy of the Agreement (exhibits omitted) is attached hereto as **Exhibit 1**.

8.    Section 6.09 the Agreement required BrickCraft to purchase on-hand brick inventory from Brampton "in twelve (12) equal monthly installments, without interest, starting thirty (30) days after the Closing Date." *Exhibit 1*, Section 6.09.

9.    As of the Second Count Inventory Date (defined in the Agreement as September 12, 2024), the total value of Brampton's on-hand brick inventory was approximately $2.21 million.

10.    The parties agreed that "[t]he Second Count Inventory Date determination will be binding on the parties, absent manifest error." *Id*.

11.    No provision exists in the Agreement that allows any party to make deductions from the Purchase Price for any reason.

12.    Separately, the parties agreed to certain obligations with respect to the scrubber

system located at Brampton's facility in Farmersburg, Indiana (the "Scrubber"):

> Within sixty (60) days after the Closing, the Seller will pay for and cause the inspection by the manufacturer of the scrubber, on the Owned Real Property. The Seller will pay the expense to make any recommended repairs and components *as needed to be in compliance with Seller's IDEM Part 70 Permit #T153-37727-00033*, and agrees to warrant the scrubber for a period of one year after Closing, *except for any issues relating to the scrubber repairs caused by the negligence, gross negligence, or intentional misconduct of the Buyer*.

*Exhibit 1*, Section 6.14 (emphasis added).

13.     No provision exists in the Agreement that obligates Brampton to pay for repairs, components or other general upgrades to the scrubber which are not required for compliance with the IDEM Permit.

14.     Prior to formal execution of the Agreement, Plaintiff and Defendants (through Defendants' parent company, Halquist Stone Company, LLC) negotiated the terms of the eventual transaction pursuant to that certain Non-Binding Letter of Intent dated April 19, 2024 (the "LOI"). A true and accurate copy of the LOI is attached hereto as **Exhibit 2**.

15.     For the avoidance of doubt, on September 6, 2024, counsel for Defendants and Halquist Stone Company, LLC, provided notice to Brampton pursuant to the terms of the LOI that Defendants were "terminating discussions and negotiations regarding the proposed transaction and has elected not to pursue same." A true and accurate copy of the September 6, 2024, correspondence is attached hereto as **Exhibit 3**.

16.     Accordingly, on September 6, 2024, Defendants terminated the LOI and its non-binding and binding provisions became null and void.

17.     The binding Agreement governing the parties' respective rights and obligations with regard to the transaction, including but not limited to the rights and obligations with regard to on-hand inventory of Brampton, was not executed until September 13, 2024.

3

18.     No provision exists in the Agreement that restricted Brampton from the use or movement of its own on-hand inventory between facility locations commonly owned by Brampton before formal execution of the Agreement.

## DEFENDANTS' IMPROPER DEDUCTIONS FROM PURCHASE PRICE

### A.     The Marshall Brick

19.     On May 15, 2025, BrickCraft notified Brampton of an alleged quality complaint received from one if its contractors involving Marshall Queen Size Brick (Run #PR10422) (the "Marshall Brick"). A true and accurate copy of the correspondence related to the Marshall Brick is attached hereto as **Exhibit 4**.

20.     BrickCraft claimed that the entire production run, consisting of 822,976 units of brick valued at $131,676.16 pursuant to the binding Second Count Inventory determination, should be considered "manufacturing defective" and therefore should have been assigned zero value under the Agreement.

21.     Based upon its own determination and contrary to the express terms of the Agreement, BrickCraft wrongly deducted the sum of $131,676.16 from the installment payment due June 2025.

22.     The Agreement provides that the Second Count Inventory determination "will be binding on the parties, absent manifest error." No manifest error was identified by BrickCraft, and as explained below, no manifest error was made by Brampton.

23.     In addition, the Agreement contains no provision permitting retroactive revaluation of inventory based upon a downstream customer complaint.

24.     Brampton immediately investigated the complaint and, on May 20, 2025, confirmed that "no other instances of a similar nature have been reported" with respect to the

4

Marshall Brick, and offered to arrange for the customer to receive professional brick tinting (as is common in the industry) as a gesture of goodwill.

25. On May 28, 2025, Brampton's Vice President of Sales visited the project site and determined that the condition of the Marshall Brick resulted from excessive cleaning done by the contractor, including chemical treatment and pressure washing.

26. The contractor determined the total repair costs for the Marshall Brick to be approximately $5,200.00 and requested that such repair costs be split equally between the contractor and BrickCraft.

27. BrickCraft did not identify any additional complaints involving Marshall Brick and agreed the alleged issue was isolated to only the Run #PR10422 of Marshall Brick distributed to this contractor.

28. BrickCraft nevertheless unilaterally deducted $131,676.16 from the June 2025 installment payment properly due and payable to Brampton under Section 6.09 of the Agreement.

29. The deduction was not authorized by the unambiguous terms of the Agreement, nor was the deduction authorized or accepted by Brampton.

### B.    The Scrubber System

30. As mentioned above, Section 6.14 of the Agreement narrowly limited Brampton's obligation with respect to the Scrubber to inspection and payment of recommended repairs and components "as needed to be in compliance with Seller's IDEM Part 70 Permit #T153-37727-00033." (*Exhibit 1*, Section 6.14).

31. Section 6.14 does not obligate Brampton to fund items such as capital improvements, elective maintenance, upgrades, system modifications, or other general enhancements unrelated to required IDEM compliance.

32.    On September 4, 2024, Brampton received the final inspection report from Hellmich, the original equipment manufacturer of the Scrubber. A true and accurate copy of the Hellmich Inspection Report is attached hereto as **Exhibit 5**.

33.    The Hellmich Inspection Report identified the required repairs and components necessary for compliance with the IDEM permit.

34.    In November 2025, Brampton requested that Hellmich provide a written breakdown of the recommended repairs necessary to address the Hellmich Inspection Report which totaled approximately $57,900.00, including labor and installation, travel accommodations (Hellmich is located in Germany), and related costs. A true and accurate copy of the November 7, 2025 correspondence from Hellmich to Brampton is attached hereto as **Exhibit 6**.

35.    Brampton completed and paid for the required repairs and components necessary for compliance with the IDEM permit and that were identified by the Hellmich Inspection Report.

36.    Subsequently, BrickCraft deducted the total sum of $350,818.28 from the installment payments due and payable to Brampton pursuant to Section 6.09 of the Agreement, relying upon invoices that included additional work, upgrades, and system modifications beyond the scope of Section 6.14. True and accurate copies of the invoices submitted by BrickCraft are collectively attached as **Exhibit 7**.

37.    The Agreement does not permit expansion of Section 6.14 beyond its express language.

38.    After crediting the approximate $57,900.00 attributable to the necessary repairs and components identified by Hellmich required for compliance with the IDEM permit, BrickCraft has improperly withheld the sum of $292,918.28 from the installment payments due and payable to Brampton pursuant to Section 6.09 of the Agreement.

6

**B.      The Strapping Material**

39.      On or about July 16, 2024, a truckload of Signode brick strapping was delivered to Brampton's Farmersburg, Indiana facility for use in production.

40.      The Farmersburg facility later ceased operations on August 2, 2024.

41.      As a result of the planned shutdown, the Farmersburg facility held more Signode brick strapping in inventory than it needed for its remaining operations.

42.      On August 28, 2024, in the ordinary course of business and before execution of the Agreement, Brampton transferred 15 pallets of the excess strapping to its other plant as the same strapping is used for other production lines.

43.      On September 6, 2024, BrickCraft confirmed in writing that it was terminating negotiations and not proceeding with the proposed transaction. (*Exhibit 3.*)

44.      As a result, both the binding and nonbinding provisions of the LOI between the parties terminated in accordance with its terms.

45.      The binding Agreement was not executed until September 13, 2024. (*Exhibit 1.*)

46.      No provision of the Agreement retroactively restricted Brampton from transporting excess strapping material between its commonly owned facilities before execution of the Agreement. (*Id.*)

47.      Nevertheless, on October 22, 2024, BrickCraft improperly deducted the sum of $52,200.00 from the November 2025 installment payment due and payable to Brampton under Section 6.09 of the Agreement.

48.      The Agreement does not authorize retroactive application of its provisions to conduct occurring before execution.

49.      The Agreement does not authorize unilateral deductions from the Purchase Price or

grant BrickCraft the right to reduce the amount of an upcoming installment payment.

50.     The wrongful deductions by BrickCraft were therefore unauthorized and constitute a breach of the Agreement.

## DAMAGES INCURRED BY BRAMPTON

51.     On November 27, 2025, Brampton properly provided written notice to Defendants of their collective breaches of their payment obligations under the Agreement. A true and accurate copy of the Demand Letter sent on November 27, 2025 is attached hereto as **Exhibit 8**.

52.     On December 16, 2025, Defendants acknowledged in writing their wrongful withholding of amounts properly due and payable under the Agreement with respect to the Marshall Brick and wired a partial payment of $131,676.16. A true and accurate copy of this correspondence is attached hereto as **Exhibit 9**.

53.     Defendants continue to withhold the sum of $403,018.28 from installment payments due and owing to Brampton as required under Section 6.09 of the Agreement.

54.     Brampton has neither waived nor excused its right to the payments identified above.

55.     Brampton has fully performed its obligations under the Agreement.

56.     Defendants' unilateral and wrongful deductions and subsequent refusal to pay the amounts due and owing to Brampton constitute material breaches of the Agreement.

## COUNT I – Breach of Contract

57.     Brampton incorporates by reference the foregoing paragraphs as if fully restated herein.

58.     The Agreement is a valid and enforceable contract supported by adequate consideration and negotiated at arms-length by sophisticated commercial entities.

59.     The Agreement fixed the Purchase Price and separately required Defendants to purchase the on-hand brick inventory in twelve equal monthly installments, without interest, beginning thirty days after Closing.

60.     The parties expressly agreed that the Second Count Inventory determination would be binding absent manifest error. No manifest error was identified or established.

61.     The Agreement contains no provision permitting Defendants to revalue inventory after Closing, to apply retroactive adjustments based on downstream customer complaints, or to unilaterally deduct disputed claims from the mandatory installment payments.

62.     Section 6.14 narrowly limited Brampton's obligation with respect to the scrubber to inspection and payment of recommended repairs and components necessary for compliance with the specified IDEM Permit.

63.     Brampton performed its obligations under the Agreement, including the conveyance of assets, delivering the inventory as valued on the Second Count Inventory Date, and funding the required IDEM-compliance repairs to the Scrubber.

64.     Beginning in June 2025, Defendants materially breached the Agreement by unilaterally reducing required installment payments under Section 6.09 based on claims not authorized by the Agreement, including deductions relating to the Marshall Brick production run, Scrubber work exceeding the scope of Section 6.14, and the alleged transfer of strapping material occurring prior to execution of the Agreement.

65.     The unilateral deductions made by Defendants constitute impermissible self-help offsets and have attempted to alter the mandatory installment structure formally agreed upon by the parties in writing.

66.     After acknowledgement and partial repayment of the wrongful Marshall Brick

deduction, Defendants continue to withhold the sum of $403,018.28 in amounts due and owing to Brampton under Section 6.09 of the Agreement.

67. Defendants' refusal to remit the full installment amounts due under the Agreement constitutes a material breach of the same.

68. As a direct and proximate result of Defendants' breach, Brampton has suffered damages in the amount of $403,018.28, together with pre-judgment interest, post-judgment interest, its reasonable attorneys' fees pursuant to the Agreement if the Court determines Brampton to be the prevailing party, and costs of enforcement.

WHEREFORE, Plaintiff, Brampton Brick, Inc., by counsel, respectfully requests that the Court enter judgment for Brampton and against Defendants for the principal amount of $403,018.28, plus pre-judgment and post-judgment interest, award Brampton its reasonable attorneys' fees, costs and expenses, and award all other just and proper relief.

### COUNT II – Unjust Enrichment

69. In the alternative to Count I, Brampton incorporates by reference the foregoing paragraphs as if fully restated herein.

70. Brampton conferred substantial economic benefits upon Defendants through delivery of inventory valued and accepted under the Agreement and by paying for Scrubber repairs required for regulatory compliance.

71. Defendants knowingly accepted and retained those benefits.

72. Defendants have withheld the sum of $403,018.28 in payments due and owing to Brampton while continuing to retain and benefit from the assets and improvements provided by Brampton.

73. Defendants' retention of those benefits without full compensation to Brampton

would be unjust.

74.    Brampton is entitled to restitution in the amount properly withheld, together with interest.

WHEREFORE, Plaintiff, Brampton Brick, Inc., by counsel, respectfully requests that the Court enter judgment for Brampton and against Defendants for the principal amount of $403,018.28, plus pre-judgment and post-judgment interest, award Brampton its reasonable attorneys' fees, costs and expenses, and award all other just and proper relief.

## JURY DEMAND

Plaintiff, Brampton Brick, Inc., by counsel, respectfully demands a jury as to all issues and counts so triable.

Dated:  March 10, 2026

Respectfully submitted,

HACKMAN HULETT LLP

/s/ Anthony S. Ridolfo
Anthony S. Ridolfo (Atty. #22824-49)
Jacob P. Eckhardt (Atty. #37625-06)
135 N. Pennsylvania Street, Suite 1610
Indianapolis, IN 46204
Phone: (317) 636-5401
Email: aridolfo@hhlaw-in.com
       jeckhardt@hhlaw-in.com

Counsel for Plaintiff, Brampton Brick, Inc.